# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 23, 2025

Lyle W. Cayce
Clerk

_____

No. 22-60514

_____

NATIONAL LABOR RELATIONS BOARD,

*Petitioner*,

*versus*

ALLSERVICE PLUMBING AND MAINTENANCE, INCORPORATED,

*Respondent*,

CONSOLIDATED WITH

_____

No. 23-60293

_____

ALLSERVICE PLUMBING AND MAINTENANCE, INCORPORATED,

*Petitioner*,

*versus*

NATIONAL LABOR RELATIONS BOARD,

*Respondent*.

_____

Petition for Review from the
National Labor Relations Board
Agency Nos. 15-CA-19433, 15-CA-19456,
15-CA-19433, 15-CA-19456

_____

Before Dennis, Engelhardt, and Oldham, *Circuit Judges*.

Andrew S. Oldham, *Circuit Judge*:

The National Labor Relations Board seeks permission to enforce a nearly-decade-old order against AllService Plumbing and Maintenance, Inc. The company cross-petitions for review of the timeworn order. We deny the NLRB's motion and grant AllService's.

I

A

AllService Plumbing and Maintenance, Inc. ("AllService") is a small, family-owned plumbing company in Baton Rouge, Louisiana. In 2009, an organizer named Charles LeBlanc began a drive to unionize AllService's workforce. LeBlanc visited two AllService jobsites, spoke with AllService employees about the union, and distributed various materials to promote unionization.

One employee, Joe Lungrin, voiced opposition to the organizing effort. He called Luke Hall, AllService's Vice President, and notified him about LeBlanc's activities. Lungrin allegedly expressed concern that the company might close if its employees unionized.

About a month later, the union filed a certification-of-representative petition with the National Labor Relations Board ("NLRB" or "Board"). The union sought to hold an election among AllService's "plumbers, plumbers helpers, and apprentice plumbers." ROA.328.[1] AllService and the union agreed on an election date. After that agreement, AllService laid off three plumbing employees.

---

[1] All ROA cites refer to the record in Case No. 23-60293.

No. 22-60514
c/w No. 23-60293

Then, a week before the election, the union held an organizing meeting at a Hooters restaurant in Baton Rouge. Lungrin attended that meeting. So too did LeBlanc, who had met with several AllService employees, including some of those who had been laid off. After the Hooters meeting, LeBlanc went to the AllService office to distribute more organizing materials. The day before the election, Lungrin again opposed LeBlanc's efforts. On election day, the union lost.

After the election, Lungrin celebrated the union's defeat in front of other AllService employees. Lungrin also told Vice President Hall that someone had come into the AllService facility and taken photos of company bulletin boards for later use by the union. According to another AllService employee, Hall said if he ever found out who that was, he would "have his balls." ROA.1732.

The union filed a complaint with the Board claiming that AllService violated the National Labor Relations Act ("NLRA"). According to the complaint, Lungrin unlawfully surveilled, threatened, and interrogated other employees. The union also charged that AllService effectuated its pre-election layoffs because of those employees' involvement with union activities.

An NLRB administrative law judge ("ALJ") heard testimony and issued a decision in 2011. The ALJ mostly agreed with the charges in the union's complaint. It held that AllService violated the NLRA because of Lungrin's various activities and that the layoffs were unlawfully related to protected union activity. The ALJ then ordered AllService to reinstate the three discharged employees with backpay and daily compound interest.

AllService did not file timely exceptions to the 2011 order. So in January 2012, the NLRB entered an order adopting the ALJ's findings and conclusions. A second ALJ heard the case in March 2013 to calculate damages. In May 2013, the NLRB's second ALJ ruled against AllService and ordered

3

the company to pay over $100,000 in damages. In July 2013, the full Board agreed with its ALJ's 2013 decision.

B

The Board then asked us for permission to enforce the July 2013 order. But while the NLRB's petition was pending, the Supreme Court decided *NLRB v. Noel Canning*, 573 U.S. 513 (2014). In that landmark decision, the Court held that three of the five then-sitting members of the NLRB were not validly appointed. *See id.* at 557. Consequently, the Board did not have a quorum to affirm the backpay orders against AllService, rendering those orders (and the Board's requests that we enter injunctions enforcing them) unlawful. Recognizing that its orders were legally infirm in light of the Supreme Court's ruling, the NLRB set aside its own decision adopting its ALJ's 2013 backpay order. The NLRB then moved to dismiss its enforcement petition. We granted that motion.

In the wake of *Noel Canning*, the Board attempted to restore its vitiated decisions *en masse*. First, "the NLRB unanimously ratified *nunc pro tunc* the appointments of three of its regional directors and five of its ALJs, and those regional directors ratified all actions taken by them or on their behalf from the dates of their initial appointments." Gideon Mark, *SEC and CFTC Administrative Proceedings*, 19 U. Pa. J. Const. L. 45, 114–15 (2016). Then the Board reviewed the vitiated decisions and ratified those *nunc pro tunc* too, "generally rubber-stamping its prior opinions, even when controversial." *Id.* at 115 (quotation omitted).

But for whatever reason, the Board left AllService's case dismissed. And it sat there on the Board's docket gathering dust. We closed our docket on the matter. Eight years passed. All remained quiet.

No. 22-60514
c/w No. 23-60293

## C

Then, in 2022, a bolt from the blue: The NLRB issued a "Notice to Show Cause" asking AllService for any reason it ought not issue a supplemental order re-adopting the nine-year-old ALJ backpay decision from 2013. The Board blamed the delay on its own "administrative oversight." ROA.314. AllService objected, arguing adoption of the old order would be unfair because (1) in May 2016, AllService suffered a flood that destroyed "[a]ll [of its] records, computers, vehicles, construction equipment, etc." ROA.317. Then (2) it suffered another flood in May 2021 and again lost all of its records and computers. AllService further explained it is a "minority owned and operated 'Mom and Pop' shop" that has "not resourcefully []or financially recovered from" the two floods that postdated the Board's 2013 decision. *Ibid.* The employer concluded: "AllService Plumbing and Maintenance is in no way, now, prepared to readdress these cases with past records or financially, and we ask for relief from this matter." *Ibid.* The NLRB ignored all of this and again adopted the 2013 ALJ decision.

The NLRB then applied to this court for summary enforcement of its 2022 supplemental order. Subsequently, AllService filed a petition for review of the same order. After hearing oral argument on the Board's application for summary enforcement, we consolidated both cases and placed the summary enforcement case in abeyance pending the conclusion of briefing in the petition for review case. We now decide both petitions. *See* 29 U.S.C. § 160(f).

## II

We first deny the Board's request for summary enforcement of its aged 2013 order. We do so because the Board failed to carry its burden to prove that enforcement would be equitable.

5

No. 22-60514
c/w No. 23-60293

A

Unlike every other agency in the country, the NLRB has no power to issue self-executing orders. Congress instead vested enforcement power in us: Under the NLRA, we must use the equitable powers of the federal courts to issue injunctions to enforce, or modify, or decline to enforce the Board's decisions. 29 U.S.C. § 160(e)–(f). As we previously explained:

> The NLRB may be the only agency that needs a court's imprimatur to render its orders enforceable. *NLRB v. Thill, Inc.*, 980 F.2d 1137, 1142 (7th Cir. 1992) ("Unlike the orders of other agencies, the Board's orders are not self-executing."); *see also Mitchellace, Inc. v. NLRB*, 90 F.3d 1150, 1159 (6th Cir. 1996) (similar); *E.I. Du Pont De Nemours & Co. v. NLRB*, 682 F.3d 65, 71 (D.C. Cir. 2012) (Randolph, J., concurring in part and concurring in the judgment) (same). Congress has long limited the Board's powers in this way, though the Board wasn't always alone in being so limited. As the Seventh Circuit explained, "the curious impotence of unenforced orders of the Board is the result of a decision by the Congress that enacted the Wagner Act to give the Board it was creating the same procedures as the Federal Trade Commission then had." *NLRB v. P\*I\*E Nationwide, Inc.*, 894 F.2d 887, 892 (7th Cir. 1990). And for "both agencies, the denial of teeth to the agency's orders was a swap for procedural informality." *Ibid.* The Administrative Procedure Act brought more formality to administrative proceedings; thereafter, Congress gave the FTC enforcement power. *Ibid.* But Congress never did the same for the NLRB. *Ibid.* Thus, what was true in 1938 remains true today: "The Board is given no power of enforcement. Compliance is not obligatory until the court, on petition of the Board or any party aggrieved, shall have entered a decree enforcing the order as made, or as modified by the court." *In re NLRB*, 304 U.S. 486, 495 (1938); *see also* 29 U.S.C. § 160(e)–(f). And now, as then, when a court "enforces" an order,

No. 22-60514
c/w No. 23-60293

"[t]he order issued by the court is an injunction, enforceable
by contempt." *P*I*E Nationwide, Inc.*, 894 F.2d at 893.

*Dish Network Corp. v. NLRB*, 953 F.3d 370, 375 n.2 (5th Cir. 2020). In this
unique statutory scheme, the federal courts play an important role in NLRB
enforcement.

That role means that "the balance struck by the Board is [not] im-
mune from judicial examination and reversal in proper cases. Courts are ex-
pressly empowered to enforce, modify or set aside, in whole or in part, the
Board's orders." *Johns-Manville Prods. Corp. v. NLRB*, 557 F.2d 1126, 1132
(5th Cir. 1977). To "stand aside and rubber-stamp" Board actions we "deem
inconsistent with a statutory mandate or that frustrate the congressional pol-
icy underlying a statute" would "abdicate [our] responsibility." *Ibid.* Our
court and our sister circuits have therefore long exercised equitable discre-
tion over whether to enter injunctions enforcing NLRB orders. *See, e.g.*,
*Thryv, Inc. v. NLRB*, 102 F.4th 727, 748 (5th Cir. 2024) (denying enforce-
ment of an NLRB order because it had become stale and unnecessary);
*Cont'l Web Press, Inc. v. NLRB*, 742 F.2d 1087, 1095 (7th Cir. 1984) (declin-
ing to enforce an NLRB order because of the equitable defense of laches);
*NLRB v. Greensboro News & Record, Inc.*, 843 F.2d 795, 798 (4th Cir. 1988)
(refusing enforcement because it was "both unnecessary and obsolete");
*Brockway Motor Trucks v. NLRB*, 582 F.2d 720, 740–41 (3d Cir. 1978) (refus-
ing enforcement where it is futile); *NLRB v. Maywood Plant of Grede Plastics*,
628 F.2d 1, 6–7 (D.C. Cir. 1980) (refusing enforcement on the grounds that
significant time had passed since the alleged violation, such that enforcement
rested upon a questionable factual foundation); *C–B Buick, Inc. v. NLRB*,
506 F.2d 1086, 1096 (3d Cir. 1974) (similar); *NLRB v. Eanet*, 179 F.2d 15,
20–21 (D.C. Cir. 1949) (similar).

B

The Board presses two arguments in favor of enforcement: (1) Even if the Board ignored the case without excuse or justification for *almost a decade*, AllService nonetheless had an unflagging obligation to drop everything when it got the Board's 2022 Show Cause Order and to properly exhaust its objections *within 28 days*. And (2) the Board contends that its delay is "no harm, no foul" because it has a legal right to resuscitate the 2014 petition for enforcement that it filed in our court before *Noel Canning* and then dismissed after *Noel Canning*. We consider and reject both arguments in turn.

1

The Board's first argument sounds in NLRA § 10(e), which imposes an exhaustion requirement for objections to Board enforcement. *See* 29 U.S.C. § 160(e). That statute provides: "No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." *Ibid.* These objections must be filed within 28 days. *See* 29 C.F.R. §§ 102.46, 102.48 (2024). AllService filed a timely objection to the June 2022 Show Cause order. But, the Board reasons, AllService failed to raise the specific arguments before us in that response. So this court lacks jurisdiction to consider whether it would be unfair to enforce the stale 2013 order against a small, minority-owned, "Mom and Pop" shop that suffered two catastrophic floods in intervening years.

We reject the Board's understanding of § 160(e) for two reasons. First, it is unclear to us that AllService failed to exhaust its arguments against enforcement. When it comes to administrative exhaustion, federal law does not require lawyerly precision. *See Thryv*, 102 F.4th at 746 ("[Section] 10(e) does not require employers to put an issue before the [NLRB] with pristine clarity."); *see also Gulf States Mfg., Inc. v. NLRB*, 704 F.2d 1390, 1399 (5th

Cir. 1983). Rather than procedural strictures, § 160(e) merely requires that the Board be "on notice of a party's purportedly unexhausted argument." *Lion Elastomers, LLC v. NLRB*, 108 F.4th 252, 258 (5th Cir. 2024). Reading § 160(e) in statutory "context," the provision aims only "to give the Board notice and an opportunity to confront objections to its rulings before it defends them in court." *Indep. Elec. Contractors of Hous., Inc. v. NLRB*, 720 F.3d 543, 551 (5th Cir. 2013).

AllService's response to the June 2022 Show Cause order, drafted without the assistance of counsel, put the Board on clear notice that the company objected to enforcement. *See* ROA.317. AllService contended that it would be unfair to enforce a decade-old Board order given the prejudice AllService suffered in intervening years due to multiple floods. *Ibid.* That claim neatly encompasses its later objections that enforcement would prejudice AllService. *See, e.g.*, Answer to Petition for Enforcement at 2 (arguing that enforcement would "prejudice[] AllService" because the two intervening floods "severely damaged its business" and caused "a loss of its records pertaining to this case").

We decline to hold AllService to a stricter "magic words" standard. True, AllService did not explicitly mention unreasonable delay or estoppel in its *pro se* response to the Show Cause order. But that failure does not bar its subsequent and substantially similar objections. As our sister circuit noted in another administrative context:

> Appellants need not conjure any "magic words" to raise an issue, but simply need to launch the appropriate argument. The exhaustion requirement bars consideration of general issues that were not raised below, and appellants should not be penalized by evaluating form over substance where their arguments before the Board in essence raised the claim at issue.

No. 22-60514
c/w No. 23-60293

*Perez Vasquez v. Garland*, 4 F.4th 213, 228 (4th Cir. 2021) (cleaned up). All-Service's response exhausted the essence of its arguments, especially when "liberally construed" and "held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quotation omitted). AllService put the Board on notice that it objected to enforcement, and § 160(e) requires nothing more.[2]

Second, even if AllService failed to exhaust its prejudice argument, § 160(e) would excuse that failure.[3] Section 160(e) excuses a party from

---

[2] The dissenting opinion contends that this result somehow offends the rule of orderliness by conflicting with cases like *NLRB v. Mooney Aircraft, Inc.*, 310 F.2d 565 (5th Cir. 1962) (per curiam). *See post*, at 27–30 (DENNIS, J., dissenting). We have already rejected that reading of *Mooney Aircraft. See Thryv*, 102 F.4th at 741–42 (explaining that the informal, unrecorded telephone conversation at issue in *Mooney Aircraft* bears no resemblance to an employer raising an issue to the Board in writing). And we do so again today.

[3] The Board's petition for summary enforcement asserts that § 160(e) is jurisdictional. *See Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 666 (1982). The Supreme Court has instructed us, however, to read some of its older jurisdictional precedents to instead embrace claims-processing rules. *See, e.g.*, *Wilkins v. United States*, 598 U.S. 152, 159–60 (2023) ("[C]ourts, including this Court, have more than occasionally misused the term 'jurisdictional' to refer to nonjurisdictional prescriptions. The mere fact that this Court previously described something 'without elaboration' as jurisdictional therefore does not end the inquiry. To separate the wheat from the chaff, this Court has asked if the prior decision addressed whether a provision is 'technically jurisdictional'—whether it truly operates as a limit on a court's subject-matter jurisdiction—and whether anything in the decision 'turn[ed] on that characterization.'" (citations & quotations omitted)). More recent cases distinguishing between jurisdictional and claims-processing rules instruct that "[t]he procedural requirements that Congress enacts to govern the litigation process are only occasionally as strict as they seem." *Harrow v. Dep't of Def.*, 601 U.S. 480, 483 (2024). The Court's recent attempts to "bring some discipline to use of the jurisdictional label" require a clear statement from Congress before a procedural requirement is deemed jurisdictional. *Boechler, P.C. v. Comm'r*, 596 U.S. 199, 203 (2022) (quotation omitted).

Section 160(e) "imposes an exhaustion requirement, which is a quintessential claim-processing rule." *Santos-Zacaria v. Garland*, 598 U.S. 411, 417 (2023). *See also Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 166 & n.6 (2010) (collecting examples of nonjurisdictional exhaustion requirements). While language directed to courts is *sometimes*

No. 22-60514
c/w No. 23-60293

exhausting its objections under "extraordinary circumstances." And this case easily qualifies as "extraordinary."[4] As we have noted before, this exception applies where the Board causes undue delay. *See, e.g.*, *Indep. Elec. Contractors*, 720 F.3d at 551–52 (finding extraordinary circumstances where "it was unnecessary for an aggrieved party to extend a process that had already gone on intolerably long").

The dissenting opinion characterizes the circumstances here as "'extraordinary' in the common parlance," but not in the statutory sense. *Post*, at 31 (Dennis, J., dissenting). As authority for that statutory interpretation, the dissenting opinion cites *D.R. Horton, Inc. v. NLRB*, 737 F.3d 344, 351 n.5 (5th Cir. 2013). *Ibid.* But *Horton* compels the opposite result. In that case, this court found no extraordinary circumstances under § 160(e) where "all the

---

jurisdictional, *see post*, at 25 n.6 (Dennis, J., dissenting), the Supreme Court has rejected the dissent's contention that such language is *always* jurisdictional, *see Santos-Zacaria*, 598 U.S. at 420 ("Claim-processing rules can also be addressed to courts."). Exhaustion requirements, as "quintessential nonjurisdictional requirement[s]," require more than "ambiguous phrasing" to assume jurisdictional significance. *Ibid.* As a panel of this court presciently held, "§ 10(e) is essentially an exhaustion of remedies provision." *Indep. Elec. Contractors*, 720 F.3d at 550; *see also Lion Elastomers*, 108 F.4th at 258 ("This court has rejected the notion that this provision of 29 U.S.C. § 160(e) is jurisdictional . . . .").

None of this even purports to "overrule" anything. *But see post*, at 26 n.6 (Dennis, J., dissenting) (contending the opposite). We merely join the chorus of courts to comment on § 160(e) and the doubt surrounding its jurisdictional effect in light of recent Supreme Court precedent. *See, e.g.*, *New Concepts for Living, Inc. v. NLRB*, 94 F.4th 272, 296–99 (3d Cir. 2024) (Krause, J., concurring) (describing the debate and noting that the Supreme Court has not found an exhaustion requirement jurisdictional since 2006); *Quickway Transp., Inc. v. NLRB*, 117 F.4th 789, 825–26 (6th Cir. 2024) (Murphy, J., concurring in the judgment) (echoing predictions that "the Court's modern cases portend a different outcome from *Woelke*" (cleaned up)).

[4] The fact that § 160(e) admits of exceptions is another reason to think it is not jurisdictional. *See Reed Elsevier*, 559 U.S. at 165 ("It would be at least unusual to ascribe jurisdictional significance to a condition subject to . . . exceptions."); *see also Santos-Zacaria*, 598 U.S. at 416 ("[B]ecause courts are not able to exceed limits on their adjudicative authority, they cannot grant equitable exceptions to jurisdictional rules.").

legal arguments raised . . . were available to Horton from the outset." *Horton*, 737 F.3d at 351 n.5. Here, AllService's objection to enforcement was based on intervening events—including multiple floods—that had not occurred at the time of the original objection period.

And the extraordinary delay was caused exclusively by the Board's negligence. AllService had no reason to think this long-dead case was coming back to life. The Board dismissed its enforcement petition after *Noel Canning*. It set aside its order adopting the 2013 ALJ decision. And it processed other pre-*Noel Canning* cases while leaving this one undisturbed for eight years. It cannot then turn around and demand that AllService jump through an administrative hoop in 28 days upon pain of forfeiting whatever objections it wants to make against the Board's decision, and upon pain of accepting a backpay order that has been accruing daily compound interest while the Board slept.

\*

As noted above, whenever the Board invokes our power to enforce NLRB orders, we have an independent obligation to ensure enforcement would comport with federal equity principles. Here, the Board's unclean hands require denial of its application for injunctive relief, regardless of what AllService did or did not exhaust in 2022. *See Niz-Chavez v. Garland*, 593 U.S. 155, 172 (2021) ("If men must turn square corners when they deal with the government, it cannot be too much to expect the government to turn square corners when it deals with them.").

2

The Board's second justification for granting it an injunction is that everything that happened after *Noel Canning* is irrelevant. In the Board's view, all of its work was completed when it entered its order in July 2013. So

No. 22-60514
c/w No. 23-60293

in reality, its injunctive relief request in this case is just a resuscitation of the one it filed in our court in 2014.

We reject that contention because the Board dismissed with prejudice its 2014 petition after *Noel Canning*. Dismissals entered under Federal Rule of Appellate Procedure 42(b) are presumptively with prejudice. *See* 16AA Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 3988 (5th ed.) ("Courts have generally held that an appeal, once voluntarily dismissed, will not be reinstated . . . ."); *see also Colbert v. Brennan*, 752 F.3d 412, 416 (5th Cir. 2014) ("[S]uch an appeal cannot be revived after the expiration of the original appeal period.").

Moreover, our circuit rules provide a process for seeking a dismissal without prejudice, and the NLRB did not seek to utilize that procedure in 2014. *Cf.* 5th Cir. R. 42.4. In certain circumstances, a party may ask the Clerk of Court to enter the dismissal as without prejudice, in which case the appeal may be reinstated within 180 days of the dismissal. *See ibid.* "If the appeal is not reinstated within the period fixed, the appeal is deemed dismissed with prejudice." *Ibid.* That a procedure exists by which appeals may be dismissed without prejudice only confirms that voluntary dismissals of appeals are, by default, with prejudice. Moreover, the dismissal ordered by this court almost a decade ago was not explicitly without prejudice.

And even assuming that the NLRB's prior dismissal was without prejudice, our rules provide that the NLRB could have revived the suit within 180 days. The prior appeal was dismissed on July 3, 2014. The NLRB moved for summary enforcement on September 21, 2022. That is a gap of some 3,002 days, far more than would allow the Board to revive its suit under this court's rules.

Accordingly, the Board cannot pretend that it is merely resuscitating its 2014 petition for enforcement. The NLRB has zero explanation for its

13

delay—the Board even admits its own "administrative neglect." *See* Red Br. at 23. As the Board's lawyer put it at oral argument, "the cake was baked" way back in 2013 when the second NLRB ALJ entered his order against All-Service. It might be true that the NLRB finished baking more than a decade ago. But it is emphatically untrue that the Board can invoke our equitable powers to turn back time and force AllService to eat a stale, decade-old order. Nor does equity allow the Board to start a new enforcement proceeding after sleeping on the case for almost a decade. We therefore deny the NLRB's request for an injunction enforcing its order.

## III

We now turn to AllService's petition for review. That petition requires us to review the Board's conclusions of law *de novo* and its findings of fact for substantial evidence. *Brown & Root, Inc. v. NLRB*, 333 F.3d 628, 633 (5th Cir. 2003). Substantial evidence review is a term of art. It means we uphold the Board's factual findings only if they are supported by evidence that is substantial when viewed in light of the record as a whole, including "whatever in the record fairly detracts from its weight." *Dish Network*, 953 F.3d at 376 (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–88 (1951)). As Justice Frankfurter wrote in the canonical substantial evidence case *Universal Camera*: "[T]he requirement for canvassing 'the whole record' in order to ascertain substantiality" means Congress has "made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." 340 U.S. at 488. Therefore, we must reject an order of the Board when "it fail[s] to grapple with countervailing portions of the record." *Dish Network*, 953 F.3d at 377 (citing *Entergy Miss., Inc. v. NLRB*, 810 F.3d 287, 297–98 (5th Cir. 2015)).

No. 22-60514
c/w No. 23-60293

Although AllService makes other arguments that we need not reach, two are sufficient to justify granting the petition for review.[5] First, (A) the Board lacked substantial evidence to attribute Lungrin's activities to All-Service. And second, (B) the Board lacked substantial evidence to find that AllService's pre-election layoffs were related to protected union activity. Finally, (C) we conclude with a few words about the dissent's understanding of substantial evidence review.

A

The Board found that Lungrin was both a supervisor and agent of All-Service, holding the employer liable under § 8(a)(1) of the NLRA for Lungrin's hostility to the unionization effort. *See* 29 U.S.C. § 158(a)(1) (providing that an employer may not "interfere with, restrain, or coerce employees in the exercise of" their organizing and collective bargaining rights).

Under the NLRA, statements by *employees* generally cannot be attributed to an *employer*. *See id.* § 158(a) ("It shall be an unfair labor practice for an *employer* . . . ." (emphasis added)); *NLRB v. Schroeder*, 726 F.2d 967, 970 (3d Cir. 1984). Conversely, because employers often speak through specific persons, the NLRA defines the term "employer" to include their agents. *See* 29 U.S.C. § 152(2) ("The term 'employer' includes any person acting as an agent of an employer, directly or indirectly . . . ."). It has long been the case that "[a]n employer's responsibility for the acts of an agent is determined in accordance with the ordinary common law rules of agency."

_____

[5] The Board's 2022 supplemental order adopted the second ALJ's 2013 order about backpay damages, which in turn referenced the first ALJ's 2011 order about liability. Accordingly, when we hold that the Board's 2022 order lacked substantial evidence, we are referring to the content of the first ALJ's 2011 order. Because we grant AllService's petition for review on statutory grounds, we need not entertain any of its constitutional arguments.

*Poly-Am., Inc. v. NLRB*, 260 F.3d 465, 480 (5th Cir. 2001) (citing *Overnite Transp. Co. v. NLRB*, 140 F.3d 259, 265-66 (D.C. Cir. 1998)). Applying those common law rules in the NLRA context, we look to whether "an individual has either actual authority or apparent authority to act on behalf of another." *Exela Enter. Sols., Inc. v. NLRB*, 32 F.4th 436, 446 (5th Cir. 2022). Our precedents clarify that an agency relationship "must be established with regard to the specific conduct that is alleged to be unlawful." *Ibid.* (quotation omitted). Accordingly, we must take care to define the exact scope of the purported agent's role.

The Board, however, did no such thing. It noted that Lungrin's supervisory capacity at AllService was limited "solely on the basis of his ability to assign work to employees." ROA.339. It found that Lungrin did not exercise "any other supervisory responsibilities" on behalf of AllService. *Ibid.* And it recognized that Lungrin had no ability to hire, fire, discipline, set pay, speak on behalf of the company, set company policy, or generally do anything other than "assign work to employees." *Ibid.* Nevertheless, it held that "Lungrin was clearly an agent" for all purposes, because he "communicated directives about work assignments." ROA.340.

That constitutes reversible error. It might be true that Lungrin was an agent for purposes of work assignments. But his various union-related comments and actions were far outside the scope of that limited role. *Cf. Schroeder*, 726 F.2d at 970–71 (rejecting any presumption that statements by persons found to be supervisors can be necessarily attributed to the employer and instead undertaking an individualized analysis of the agency relationship). Accordingly, Lungrin's actions cannot be attributed to AllService, and the NLRB's contrary finding that AllService violated § 8(a)(1) of the NLRA must be set aside.

Confusingly, the NLRB does not contest AllService's basic premise that the Board improperly attributed to the company as a whole "the opinions and actions" of Lungrin. Blue Br. at 11–12. Rather, the Board again attempts to raise the procedural bar of 29 U.S.C. § 160(e). But as we previously held, a party satisfies § 160(e) by raising an argument before the Board *or its agent. See Thryv*, 102 F.4th at 741–42. And here, AllService fully complied with § 160(e) by presenting its agency argument to the ALJ and in its original answer to the union's complaint. *See* ROA.2282–83 (denying that Lungrin was an agent for AllService); *see also* ROA.1947 (same).

B

Finally, the pre-election layoffs. Under §§ 8(a)(1), (3), and (4) of the NLRA, an employer is generally prohibited from firing employees because they engaged in protected union activity or discouraging employees from exercising otherwise protected rights. *See* 29 U.S.C. §§ 158(a)(1), (a)(3)–(4). The Board found that AllService's layoffs were unlawfully infected with anti-union animus.

That determination must also be set aside because it is not supported by substantial evidence. The substantial evidence standard requires consideration of the Board's finding based on the record as a whole, including "whatever in the record fairly detracts from its weight." *Dish Network*, 953 F.3d at 376; (quoting *Universal Camera*, 340 U.S. at 488). Here, however, the Board failed to consider evidence that undermined its conclusion. Two points in that regard merit emphasis.

First, the ALJ relied substantially on Lungrin's statements and actions in finding that AllService harbored anti-union animus. But as we have already held, Lungrin's conduct cannot be attributed to AllService.

Second, and alternatively, outside of Lungrin's conduct, the Board's animus analysis relied on Luke Hall's alleged comment about punishing the

person who took pictures of the bulletin boards because Hall made layoff decisions. On these points, the Board presented a stylized view of the facts that ignored any evidence that did not fit in its narrative.

As to Luke Hall, the record contains substantial evidence that he did not in fact harbor anti-union bias. For example, LeBlanc testified that he never had any disagreements with Hall, and that no employee ever told him that they were concerned Hall would fire them for supporting the union. Multiple employees testified that Hall never expressed a negative opinion about the union. And the record shows that Hall hired two of the later-fired employees knowing that they were union members. Yet, the Board did not mention this evidence in its analysis of AllService's alleged anti-union animus. And the Board "bears the burden of showing that the employer acted out of antiunion animus. This means the Board must do more than simply support an inference that protected conduct is a motivating factor in the employer's decision." *Tesla, Inc. v. NLRB*, 120 F.4th 433, 441 (5th Cir. 2024) (en banc) (per curiam) (quotation marks and citation omitted). Its failure here to consider "contradictory evidence or evidence from which conflicting inferences could be drawn" means the Board's order lacks substantial evidence. *Universal Camera*, 340 U.S. at 487.

## C

In response, the dissenting opinion accuses us of interpreting substantial-evidence review in a "drastic, new, and unprecedented" way. *Post*, at 48 (DENNIS, J., dissenting). But the dissenting opinion's own cases are self-refuting.

For example, the dissenting opinion cites *Entergy*. *See id.* at 47–48 n.14 (DENNIS, J., dissenting). But *Entergy* invoked precedent dating back to the 1980s to conclude that the Board cannot "ignore[] a portion of the record" or "fail[] to adequately explain the factual basis for its opinion." *Entergy*, 810

F.3d at 297 (quoting *Lord & Taylor v. NLRB,* 703 F.2d 163, 169 (5th Cir. 1983) and citing *Amoco Prod. Co. v. NLRB,* 613 F.2d 107, 111–12 (5th Cir. 1980)).

Similarly, the dissenting opinion relies heavily on *NLRB v. Kentucky River Community Care, Inc.*, 532 U.S. 706 (2001), in arguing that the Board had substantial evidence to conclude Lungrin was a supervisor. *See post*, at 41–42 (Dennis, J., dissenting). But the dissenting opinion ignores the Supreme Court's primary holding in that case:

> [T]he burden of proving or disproving a challenged employee's supervisory status . . . is borne by the party claiming that the employee is a supervisor. For example, when the [Board's] General Counsel seeks to attribute the conduct of certain employees to the employer by virtue of their supervisory status, this rule dictates that he bear the burden of proving supervisory status.

*Ky. River*, 532 U.S. at 710–11. Here, the Board asserted Lungrin's supervisory status, so the Board bore the burden of proof. Courts have *never* been resigned to "sheer acceptance" of the Board's conclusion on that score. *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 803 (1945). And all we hold today, as we have held many times before, is that the Board did not adequately consider evidence that detracted from its preferred conclusion. *See, e.g.*, *Dish Network*, 953 F.3d at 376. Notwithstanding the dissenting opinion's assertions, there is nothing revolutionary about that.

\* \* \*

The NLRB's application for an injunction summarily enforcing its order is DENIED. AllService's petition for review is GRANTED.

No. 22-60514
c/w No. 23-60293

James L. Dennis, *Circuit Judge*, dissenting:

This should have been a straightforward appeal. Instead, the majority seizes the opportunity to erect unprecedented obstacles to the National Labor Relations Board's ability to enforce our Nation's labor laws. For starters, the majority stitches together a patchwork of irrelevant precedent to support its contention that enforcing the Board's order would be inequitable. It does so despite the employer's failure to preserve or exhaust its objections before the Board and despite substantial evidence supporting the Board's decision. Decades of our precedent require objections to be preserved in written exceptions to the Board. And opting for boundless judicial discretion in lieu of the complexities of Congress's instruction is untenable. *See Tesla, Inc. v. NLRB*, 120 F.4th 433, 450 n.14 (5th Cir. 2024) (Dennis, J., dissenting) ("[T]hose kind of policy judgments, under our separation of powers, come from Congress and the President, not judges."). But the majority does not stop there. It concludes—without any textual support—that the Board's prior voluntary dismissal of its summary enforcement application against AllService Plumbing and Maintenance, Inc. must be presumed to be with prejudice, thereby barring review of the Board's current application. That is simply wrong. The text of our prior dismissal says nothing about prejudice, and no authority makes the dismissal with prejudice by default. The majority closes its opinion by doing violence to this court's substantial evidence standard of review in a way no party has urged. Now, according to the majority, the Board's failure to explicitly address each piece of contradictory evidence individually in its written decision is enough to negate substantial evidence altogether. I have found no support for such a position and, in fact, I think it frustrates the intent of the National Labor Relations Act.

Because nothing bars us from considering the Board's application and the Board has established its entitlement to summary enforcement, I would

20

grant its application. Likewise, because I would find the Board's order is supported by substantial evidence, I would deny AllService's petition for review. I respectfully dissent.

I

AllService is a Louisiana-based plumbing contractor owned by Luke and Janice Hall. Mr. Hall is AllService's vice president, general manager, and master plumber, and his wife, Mrs. Hall, is the president and operations officer. During the events underlying this case, AllService employed Joe Lungrin, an experienced plumber, to supervise work at AllService's North Oaks Medical Center jobsite. Ms. Hall referred to Lungrin as the "eyes and ears of the employer" who would monitor the progress of work and assign employees various tasks at his discretion. Mr. Hall principally relied on Lungrin's supervision to manage his workforce as he would visit the North Oaks jobsite only twice per week. And due to his significantly greater experience than other employees at AllService, Lungrin was responsible for directing employees throughout their workday, examining blueprints, and advising the Halls when additional workers were needed. Unsurprisingly then, many AllService employees referred to Lungrin as their "boss," "supervisor," or "superintendent."

In late 2009, the United Association of Journeymen and Apprentices of the Plumbing Industry of the United States and Canada, Local 198 (the "Union") began campaigning to unionize AllService's plumbing workforce. The effort involved visiting AllService's jobsites, distributing Union leaflets to AllService employees, and organizing Union meetings. On December 14, 2009, Union organizer Charles LeBlanc visited AllService's North Oaks jobsite to advise AllService employees about the Union and provide related materials. At North Oaks, Leblanc met with supervisor Lungrin and employees Doug Diamond, Michael Grimes, and others. Lungrin told

LeBlanc that AllService was "a nonunion enterprise," but this was undercut by Grimes signing an authorization card in Lungrin's presence. After LeBlanc departed, Lungrin phoned Mr. Hall to inform him that "the Union is here trying to get the people to go Union." After his call, Lungrin relayed Mr. Hall's words to other AllService employees that "he would close his doors before he went Union." Soon after, the Union filed a certification of representation petition with the Board. AllService and the Union agreed on an election date. After that agreement, AllService laid off three plumbing employees—Brady Barbour, Diamond, and Grimes—allegedly due to their involvement in Union activities.

On February 11, 2010, the Union and LeBlanc held an organizing meeting at a Hooters restaurant. Lungrin also appeared and sat at a table apart from the Union meeting but within view of the Union's table to observe. Lungrin inquired about whether Grimes, upon his arrival, was attending the meeting and, following the meeting, inquired about the union membership of another AllService employee, Brian Hernandez. A week later, LeBlanc visited AllService's parking lot to distribute Union leaflets. Lungrin approached LeBlanc, demanding he "wipe [his] ass" with a leaflet and "screamed across the parking lot that [AllService] was . . . a nonunion shop and that it would always be a nonunion shop." Mr. Hall then demanded LeBlanc leave AllService's parking lot. The next day, the Board held an election at AllService's facility. To provide "security," AllService hired Leonardo Moore—a homicide detective—who was given a list of potential voters and granted staggered entry to those identified on the list. Inside, the voting booth was directly in front of a bulletin board with the phrase "never abandon the owner or the company" written.

The Union lost by a wide margin. Lungrin celebrated, boasting that AllService "voted that [expletive] down, we told you all we didn't want it." Soon after, Lungrin announced that someone had taken pictures of the

facility (including the bulletin board) and provided them to the Union, and suggested Mr. Hall shoot the culprit "between the eyes." Lungrin also relayed the words of Mr. Hall to AllService employees, saying that should Mr. Hall identify the responsible individual, he would "have his balls."

It should come as no surprise that the Union filed a complaint with the Board alleging violations of Section 8(a)(1), (3), and (4) of the NLRA. It contended that AllService unlawfully engaged in surveillance of Union activities, threatened and interrogated its employees for engaging in Union activities, and terminated Barbour, Diamond, and Grimes due to their Union activities. In December 2011, an administrative law judge (ALJ) agreed on all counts and ordered AllService to reinstate the unlawfully terminated employees with backpay. AllService did not file any objections before the Board and, in January 2012, the Board adopted the ALJ's recommendation pursuant to Section 10(c) of the NLRA, which provides that an ALJ's recommendation "shall become the order of the Board" if no objections are filed. 29 U.S.C. § 160(c).

In March 2013, a supplemental proceeding was tried before a different ALJ to determine the amount of backpay owed by AllService to the unlawfully terminated employees. The ALJ adopted the findings from the first proceeding and prescribed the backpay owed by AllService. Once again, AllService did not file any objections before the Board, and in July 2013 the Board adopted the ALJ's recommendation. In May 2014, the Board filed an application for summary enforcement of its order in this court. While the application was pending, the Supreme Court in *NLRB v. Noel Canning*, 573 U.S. 513, 519 (2014), held that three of the then-five members of the Board had been invalidly appointed. Because the Board lacked a quorum when it adopted the ALJ's recommendation the Board later set aside its July 2013 order: "In view of the Court's decision in *Noel Canning*, pursuant to Section 10(d) of the National Labor Relations Act, the Board hereby sets aside the

unpublished Order. The Board will retain this case on its docket and take further action as appropriate." On July 2, 2014, the Board moved to dismiss its May 2014 application for summary enforcement due to the lack of an underlying order to enforce, and on July 3, 2014, we granted the motion, stating, "[u]nder FED. R. APP. P. 42(b), the case is dismissed as of July 3, 2014, pursuant to petitioner's motion." Order, *NLRB v. AllService Plumbing & Maint. Co.*, No. 14-60351 (5th Cir. July 3, 2014), ECF No. 20.

Due to an administrative oversight, the Board did not take further action until June 2022 when it issued a notice to show cause asking the parties why it should not now adopt the ALJ's 2013 recommendation. AllService filed a response, which again did not contest any of the ALJ's factual or legal findings but instead requested the case be permanently dismissed due to two floods during the intervening years that had destroyed its records and equipment. In July 2022, noting that AllService did not object to the ALJ's findings, the Board adopted the ALJ's 2013 recommendation. In September 2022, the Board filed an application for summary enforcement of its order in this court. AllService filed a two-page answer, challenging for the first time the factual and legal underpinnings of the Board's order as well as arguing that the Board unreasonably delayed adopting the ALJ's recommendation. Following the Board's application, AllService brought a petition for review concerning the same order.

## II

The Board is entitled to summary enforcement of its orders because (A) AllService did not raise objections below and no extraordinary circumstances allow AllService to raise new objections now; and (B) nothing bars our consideration of the Board's application.

No. 22-60514
c/w No. 23-60293

A

Under Section 10(e) of the NLRA, "[t]he Board shall have power to petition any court of appeals of the United States . . . for the enforcement of [its] order," and the court of appeals "shall have power . . . to make and enter a decree enforcing, modifying and enforcing as so modified, or setting aside in whole or in part the order of the Board." 29 U.S.C. § 160(e). However, "[n]o objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." *Id.* This mandatory, jurisdictional provision reflects a "'bedrock principle' that 'courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the *appropriate time*.'" *Int'l Bhd. of Elec. Workers v. NLRB*, 973 F.3d 451, 460 (5th Cir. 2020) (emphasis in original) (quoting *NLRB v. Saint-Gobain Abrasives, Inc.*, 426 F.3d 455, 458 (1st Cir. 2005)); *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 666 (1982).[6]

The majority ignores Section 10(e) of the NLRA by entertaining

---

[6] Although not disputed by AllService, the majority casts this provision of Section 10(e) as a non-jurisdictional claim-processing rule. *Ante*, at 10–11 nn.3–4. To begin, the majority's purported notation of a "discrepancy" is contrary to the Supreme Court's holding in *Woelke*, 456 U.S. at 666, as well as to our own precedents, which have faithfully applied that decision, *see, e.g.*, *NLRB v. Hous. Bldg. Servs., Inc.*, 128 F.3d 860, 863 (5th Cir. 1997). Undeterred, the majority seemingly analogizes Section 10(e) to the Immigration and Nationality Act's exhaustion provision found in 8 U.S.C. § 1252(d)(1)—the provision at issue in *Santos-Zacaria v. Garland*, 598 U.S. 411, 417 (2023). There, the Court explained that § 1252(d)(1) "imposes an exhaustion requirement, which is a quintessential claim-processing rule." *Id.*; *see also Lion Elastomers, LLC v. NLRB*, 108 F.4th 252, 258 (5th Cir. 2024). *Santos-Zacaria* found that § 1252(d)(1), while mandatory, was not jurisdictional because Congress did not clearly express such an intent. 598 U.S. at 416–17. The Court emphasized that the statute imposed obligations on parties, not courts, and avoided

25

arguments that AllService made before the ALJ but failed to raise before the Board. *Ante*, at 15–18. Section 10(e) requires that a respondent lodge its objections with the Board itself during its review of the ALJ's recommendation. These objections must take the form of written exceptions filed with the Board. *See* 29 C.F.R. § 102.46(a) (2024). And any "[m]atters not included in exceptions or cross-exceptions may not thereafter be urged before the Board, or in any further proceeding." *Id.* § 102.46(f). We confirmed this understanding in *Hallmark Phoenix 3, L.L.C. v. NLRB*, 820 F.3d 696, 709, 712–13 (5th Cir. 2016), where our court held that we lacked jurisdiction to entertain a variety of arguments made by an employer opposing an ALJ's findings because it failed to preserve them in written

---

jurisdictional language—even while adjacent provisions did not. *Id.* at 419–20.

Section 10(e) is fundamentally different. Unlike the INA provision, Section 10(e) does not reference "exhaustion," but speaks directly to the court's jurisdiction: it states that the court "shall have jurisdiction" upon the Board's petition and limits that jurisdiction to issues raised before the Board, absent "extraordinary circumstances." 29 U.S.C. § 160(e). That language directly governs the court's power, not just procedural steps for litigants. *Cf. Henderson v. Shinseki*, 562 U.S. 428, 431, 438–39 (2011) (holding statutory filing deadline was non-jurisdictional where the provision appeared in procedural subchapters and lacked jurisdictional text). Moreover, Section 10(e)'s "extraordinary circumstances" exception does not diminish the statute's jurisdictional nature. *See Bowles v. Russell*, 551 U.S. 205, 214 (2007) (holding statutory deadline for noticing an appeal was jurisdictional despite an "excusable neglect or good cause" exception); Fed. R. App. P. 4(a)(5)(A)(ii). Taken together, Section 10(e)'s language, placement in the NLRA, and exclusive focus on judicial authority reflects Congress's clear intent to cabin our jurisdiction. *See Pub. Serv. Co. of N.M. v. NLRB*, 692 F.3d 1068, 1076–77 (10th Cir. 2012) (Gorsuch, J.) ("[W]e are confident that § 160(e) is a jurisdictional limit on this court's authority, just as . . . *Woelke* said it was."); *Quickway Transp., Inc. v. NLRB*, 117 F.4th 789, 818 (6th Cir. 2024), *cert. denied*, --- S. Ct. ---, 2025 WL 889145 (U.S. Mar. 24, 2025) (Mem.) ("We join our sister circuits in determining that § 10(e) creates a jurisdictional rule. Ruling otherwise would create a circuit split where none currently exists." (citations omitted)). Because "[i]t is [the Supreme] Court's prerogative alone to overrule one of its precedents," I would faithfully apply *Woelke*. *Bosse v. Oklahoma*, 580 U.S. 1, 3 (2016) (quoting *United States v. Hatter*, 532 U.S. 557, 567 (2001)).

exceptions to the Board. This was despite the employer having addressed each argument before the ALJ via record evidence, testimony, and in its answer to the Board's complaint. *Id.* Before the ALJ, the employer advanced several reasons why it believed it had no severance obligation under the collective bargaining agreement. *Hallmark-Phoenix 3, LLC*, 361 NLRB 1304, 1309 (2014) (attaching ALJ decision). It contended that a "Duration of Agreement" clause in the parties' union contract barred severance obligations, that severance was not owed to an employee who accepted a job "of greater responsibility and skill" after being terminated, and that it did not owe a "lead pay" differential. *Id.* at 1312–14. The ALJ rejected each argument. *Id.*

After the ALJ issued its decision, the employer filed written exceptions to the Board, objecting to various findings by the ALJ but conspicuously omitted the arguments it had pressed before the ALJ above. *Hallmark Phoenix 3, L.L.C.*, 820 F.3d at 709, 712–13. When it sought our review of the Board's order, it dusted off the arguments it made to the ALJ, but not to the Board in its written exceptions. *Id.* We made clear that "[t]he Court need not—and, in fact, cannot—consider any of the above-listed arguments . . . because [the employer] waived these arguments by not making them before the Board." *Id.* at 709 (first citing 29 U.S.C. § 160(e); and then citing *Woelke*, 456 U.S. at 666).

The majority offers no response to our holding in *Hallmark Phoenix*, which is not an isolated occurrence but part of a longer line of our precedent refusing to consider arguments not preserved in written exceptions to the Board. For example, in *NLRB v. Mooney Aircraft, Inc.*, 310 F.2d 565, 565 (5th Cir. 1962), we considered "whether [an employer] duly excepted to the Trial Examiner's intermediate report" before the Board's adoption. The employer "filed no written exceptions" as required by Section 10(e) and Board regulations but "contend[ed] that objections [were] made during a

telephone conversation between its attorney and an attorney for the Board." *Id.* We held that "[t]he respondent's failure to comply with the regulations requiring the filing of written exceptions with the Board . . . entitle the petitioner to summary judgment," and we found "no extraordinary circumstances to excuse respondent from the necessity of complying with the regulations." *Id.* at 566. We have continued to hold the same across multiple cases. *See, e.g.*, *NLRB v. Wagner Elec. Corp.*, 586 F.2d 1074, 1076 n.2 (5th Cir. 1978) ("It is well settled that contentions urged [below] which are not preserved in exceptions or cross-exceptions are deemed waived, absent extraordinary circumstances." (alterations in original) (quoting *Barton Brands, LTD v. NLRB*, 529 F.2d 793, 801 (7th Cir. 1976)); *NLRB v. E. Tex. Steel Castings Co.*, 457 F.2d 879, 880 (5th Cir. 1972) ("The employer did not except to this finding by the trial examiner in seeking Board review and thus we will not now consider the contention of no authority."); *NLRB v. Zeigler, Inc.*, 298 F.2d 671, 673 (5th Cir. 1962) ("[N]o exception or objection of any kind was made by Respondent either to the Examiner's proposed order or the Board's final order concerning these matters. Consequently, we have no power to alter or modify the order."); *H.B. Zachry Co. v. NLRB*, 377 F.2d 670, 671 (5th Cir. 1967) ("With respect to the Regional Director's refusal to permit petitioner to take depositions the company failed to file due exception as required by § 10(e) of the Act. It therefore cannot raise the point now.").

The majority's response to these sturdy circuit precedents is a distillate of dictum from an opinion written by the majority's author in a different case. It points to *Thryv, Inc. v. NLRB*, 102 F.4th 727, 741–42 (5th Cir. 2024), and claims AllService satisfied Section 10(e) in some respects because it "present[ed] its . . . argument[s] to the ALJ and in its original answer to the [U]nion's complaint," and an ALJ is an "agent" of the Board. *Ante*, at 17. The majority's reliance on *Thryv* suffers from three fundamental flaws. First, the portion of *Thryv* on which the majority relies is dictum, as

28

the employer in that case presented the at-issue objection to the Board. 102 F.4th at 742 ("In all events, Thryv *did in fact* urge the Article 30 issue before the Board itself." (emphasis in original)); *see also Gochicoa v. Johnson*, 238 F.3d 278, 287 n.11 (5th Cir. 2000) ("Of course, one panel's dictum cannot bind future panels. . . . A statement should be considered dictum when it 'could have been deleted without seriously impairing the analytical foundations of the holding . . . .'" (quoting *In re Cajun Elec. Power Coop., Inc.*, 109 F.3d 248, 256 (5th Cir. 1997)). Second, the majority's argument is irreconcilable with our circuit's earlier application of Section 10(e) in *Hallmark Phoenix*. And to the extent *Thryv* stands for the proposition that arguments made before an ALJ but not before the Board are preserved for our review, we must decline to follow it under our rule of orderliness. *See United States v. Walker*, 302 F.3d 322, 325 (5th Cir. 2002).

Finally, *Thryv* did not purport to set aside the Board's own regulations. Again, "[m]atters not included in exceptions or cross-exceptions may not thereafter be urged before the Board, or in any further proceeding." 29 C.F.R. § 102.46(f). Neither party has asked that this regulation be set aside as inconsistent with Section 10(e), nor can *Thryv* be read to compel such a result. Indeed, when examining similar language in an earlier version of § 102.46,[7] the Supreme Court read the statutory and regulatory requirements to preserve objections as parallel in their aims: "[t]he rule serves a sound purpose, and unless a party's neglect to press an exception before the Board is excused by the statutory 'extraordinary circumstances' exception or unless the Board determination at issue is patently in excess of its authority, we are

---

[7] *See* 29 C.F.R. § 102.46(b)(2) (1978) ("Any exception to a ruling, finding, conclusion, or recommendation which is not specifically urged shall be deemed to have been waived. Any exception which fails to comply with the foregoing requirements may be disregarded.").

bound by it." *Detroit Edison Co. v. NLRB*, 440 U.S. 301, 311 n.10 (1979); *see also Mooney Aircraft, Inc.*, 310 F.2d at 566 ("If we should hold that we will review matters raised before [the Board's employee] even though not considered by the Board, because [he] is an 'agent' of the Board, we would virtually destroy § 102.46(b) of the Board's Rules." (alterations in original) (quoting *Kovach v. NLRB*, 229 F.2d 138, 143 (7th Cir. 1956))). Taken to its logical conclusion, the majority's view would strip § 102.46(f) of any meaning—allowing an employer to preserve arguments for all purposes simply by raising them before the ALJ, without ever presenting them in written exceptions to the Board.[8] That is not, and has never been, the law.

Here, AllService had the opportunity to object to the ALJ's recommendation with the Board at least twice, first in 2013 when the ALJ initially issued its recommendation and again in 2022 when the Board issued its show cause order. Both times, AllService failed to contest the findings supporting the ALJ's recommendation or provide a legal argument against adopting that recommendation. Absent extraordinary circumstances, then, we cannot consider the objections raised for the first time in this court challenging the facts and law determined by the ALJ.

Still, AllService argues (and the majority agrees) that there are three extraordinary circumstances justifying the tardy objections: (1) the backpay and interest that it would have to cover if the Board's order were enforced;

---

[8] The majority relies on our decision in *Lion Elastomers, LLC v. NLRB* as holding that Section 10(e) "merely requires that the Board be 'on notice of a party's purportedly unexhausted argument.'" *Ante*, at 9 (quoting 108 F.4th at 258). However, in *Lion Elastomers*, it was undisputed that the employer had "timely filed exceptions and a supporting brief to the ALJ's decision." Brief of Petitioner at 5, *Lion Elastomers, LLC v. NLRB*, No. 23-60270 (5th Cir. 2024). The Board admitted "that [§ 102.46(b)] did not apply," and the only the question presented was whether the at-issue employer "was required to file a motion for reconsideration before the Board prior to any appeal." 108 F.4th at 257 n.4, 258.

(2) a recent flood that damaged its facilities and records; and (3) its belief that the case ended some years ago. AllService points to no legal authority supporting that these are extraordinary circumstances within the meaning of Section 10(e), and it cannot. Nor can the majority. We have held an extraordinary circumstance exists when it would have been futile to object below, *Indep. Elec. Contractors of Hous., Inc. v. NLRB*, 720 F.3d 543, 551–52 (5th Cir. 2013), such as when the recent "overruling of a previously controlling [doctrine] . . . justif[ies] the failure to object until now." *NLRB v. Robin Am. Corp.*, 667 F.2d 1170, 1171 (5th Cir. 1982). By contrast, we have held that no "extraordinary circumstances" are present where a party fails to make "legal arguments . . . available to [it] from the outset." *D.R. Horton, Inc. v. NLRB*, 737 F.3d 344, 351 n.5 (5th Cir. 2013). While the eight-year delay of the Board in readopting the ALJ's recommendation may be "extraordinary" in the common parlance, none of the circumstances identified by AllService are "extraordinary" as the term is used in the statute. These circumstances did not interfere with AllService's ability to timely present its legal arguments to the Board, the same arguments it makes before our court now. In fact, the latter two circumstances identified by AllService—the intervening floods and the belief this case ended years ago—did not exist when it first failed to object in 2013.[9]

---

[9] The majority believes *D.R. Horton, Inc. v. NLRB* "compels the opposite result" because "AllService's objection to enforcement was based on intervening events—including multiple floods—that had not occurred at the time of the original objection period." *Ante*, at 11–12. Again, these intervening events have no bearing on the belated *legal* issues AllService raises before our court concerning the ALJ's 2013 decision—issues available to it "from the outset" but never included in any written exceptions. *D.R. Horton, Inc.*, 737 F.3d at 351 n.5. With respect to AllService's response to the Board's July 2022 Show Cause order, the majority characterizes its response as vaguely preserving an objection based upon "unreasonable delay or estoppel." *Ante*, at 9. That is, in essence, a laches defense that our well-settled precedent plainly forecloses. *Nabors v. NLRB*, 323 F.2d

No. 22-60514
c/w No. 23-60293

Because AllService did not raise objections to the Board and no extraordinary circumstances allow AllService to raise new objections now, the Board is entitled to summary enforcement of its order.

B

That should be the end of the story. However, the majority offers two other reasons to deny summary enforcement of the Board's order notwithstanding AllService's failure to raise timely objections before the Board. First, that federal equity principles "require denial of [the Board's] application for injunctive relief, regardless of what AllService did or did not exhaust . . . ." *Ante*, at 12. And second, that the Board's dismissal of its earlier enforcement action was presumptively with prejudice. *Id.* at 14. I respectfully disagree on both counts.

1

It is true enough that we may exercise a careful degree of equitable discretion to enforce, modify, or deny Board orders. *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 899 (1984) (citing 29 U.S.C. § 160(e)). But discretion does not grant us a permission slip to become policymakers. As in all cases where we exercise our discretion, we must "guard against the danger of sliding unconsciously from the narrow confines of law into the more spacious domain of policy." *Id.* (quoting *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 194 (1941)). I view the majority's construction of our discretion and its contention that nebulous equitable principles mandate the wholesale rejection of the Board's order here as unsupported by precedent and a conscious engagement in judicial policymaking.

_____

686, 688–89 (5th Cir. 1963) (holding that the Board is not subject to the defense of laches when it brings an enforcement action); *Entergy Miss., Inc. v. NLRB*, 810 F.3d 287, 298–99 (5th Cir. 2015) (reaffirming *Nabors*).

The majority first defines the nature of our court's enforcement order as an exercise of our inherent equitable power to issue injunctions. To do this, the majority's author relies on another of his opinions, this time *Dish Network Corp. v. NLRB*, 953 F.3d 370 (5th Cir. 2020). That opinion, in a dicta-filled footnote, adopted a superficial observation of the Seventh Circuit's opinion in *NLRB v. P\*I\*E Nationwide, Inc.*, 894 F.2d 887 (7th Cir. 1990) (Posner, J.)—that an enforcement "order issued by the court is an injunction, enforceable by contempt." *Dish Network Corp.*, 953 F.3d at 375 n.2 (quoting *P\*I\*E Nationwide, Inc.*, 894 F.2d at 893).

As the majority notes, the Seventh Circuit's holding credits the view that enforcing an order of the Board, much like "[t]he issuance of an injunction," is an "exercise of an equitable power, and is subject to the equitable constraints . . . ." *P\*I\*E Nationwide, Inc.*, 894 F.2d at 893. But the Seventh Circuit made equally clear that judicial review of Board orders under our equitable authority does not grant us a blank check to "substitute [our] conception of equitable labor relations for that of Congress and the Board." *Id.* Rather, we "must take as given the value choices embodied in the statutes and policies administered by the Board;" after all, "a modern federal equity judge does not have the discretion of a medieval Lord Chancellor to grant or withhold a remedy." *Id.*; *see also Ford Motor Co. v. NLRB*, 305 U.S. 364, 373 (1939) ("[T]he court must act within the bounds of the [NLRA] and without intruding upon the administrative province[.]"). Put plainly, "where the Board has acted properly within its designated sphere, the court is required to grant enforcement of the Board's order." *NLRB v. Warren Co.*, 350 U.S. 107, 112 (1955) (Warren, C.J.).

The majority sidesteps these age-old principles by suggesting the Board's delay alone is sufficient justification to deny its application for summary enforcement. For support, the majority relies on a patchwork of caselaw from our sister circuits declining to enforce aged bargaining orders.

*Ante*, at 7. But the distinction between the equities involved in the Board's enforcement action here and that of the authorities relied upon by the majority is clear: we are asked to enforce an order of backpay for unlawful termination, not a bargaining order. The latter necessarily requires a supported union—a quality that may change over time. *See Tex. Petrochemicals Corp. v. NLRB*, 923 F.2d 398, 406 (5th Cir. 1991) ("[W]ere we to enforce this bargaining order without ascertaining the employees' present desires, it would be tantamount to ignoring their statutory rights.")

It is only because bargaining orders require some present indication of union support that the decisions of our sister circuits cited by the majority, *ante*, at 7, have found Board delay a sufficient reason to modify or deny its orders. *See, e.g.*, *Cont'l Web Press, Inc. v. NLRB*, 742 F.2d 1087, 1095 (7th Cir. 1984) ("The Board has only itself to blame for having let this proceeding stretch out to the point where it is quite likely that a bargaining order would be irrelevant to the current conditions in the plant."); *NLRB v. Greensboro News & Rec., Inc.*, 843 F.2d 795, 798 (4th Cir. 1988) (dismissing enforcement action because "widespread personnel changes in the plant have made the [bargaining] order unnecessary"); *Brockway Motor Trucks v. NLRB*, 582 F.2d 720, 740–41 (3d Cir. 1978) (declining to enforce a bargaining order because the employer "ceased all of its truck-related business operations"); *C-B Buick, Inc. v. NLRB*, 506 F.2d 1086, 1096 (3d Cir. 1974) ("[O]ur refusal to enforce the Board's order is prompted by the dilution in relevancy occasioned by the passage of time and the execution of the present collective bargaining agreement."); *NLRB v. Eanet*, 179 F.2d 15, 17 (D.C. Cir. 1949) (declining to enforce an aged bargaining order concerning hotel employees because "[i]t is common knowledge that the personnel, such as bellboys, elevator operators, maids and janitors, of small hotels constantly changes").

The remedy at issue here—backpay—serves a different purpose than a bargaining order and involves a different balance of equities for which Board

No. 22-60514
c/w No. 23-60293

delay does not, and cannot, prevent our entry. On this point, the majority spills much ink mourning the adverse impact to AllService should we enforce the Board's delayed order but says nothing about the impact to the wronged employees. I don't think that's quite right. *See J. H. Rutter-Rex Mfg. Co. v. NLRB*, 399 F.2d 356 (5th Cir. 1968), *rev'd*, 396 U.S. 258 (1969). In *J. H. Rutter-Rex*, our court reduced—but did not outright deny—a supplemental backpay order to account for four years of agency delay following our enforcement of an earlier, related order. *Id.* at 358, 362. We reasoned that the employer was "lulled . . . into the belief that the Board was satisfied and that no further action was to be expected." *Id.* at 363. To prevent "injustice to the Company," then, our court felt it equitable to limit backpay to no more than two years following our original enforcement decree. *Id.* at 365.

The Supreme Court reversed, holding that wronged employees should not be penalized for delays caused by the Board because "[w]ronged employees are at least as much injured by the Board's delay in collecting their back pay as is the wrongdoing employer." *NLRB v. J. H. Rutter-Rex Mfg. Co.*, 396 U.S. 258, 264 (1969). Put another way, "the Board is not required to place the consequences of its own delay, even if inordinate, upon wronged employees to the benefit of wrongdoing employers." *Id.* at 264–65 (citations omitted). In concluding, the Court aptly described the nature of the competing equities at issue here:

> We do not mean that delay in the administrative process is other than deplorable. It is deplorable if, as the Court of Appeals thought, the company was hampered in the presentation of its defenses to the back pay specification by the delay. It is even more deplorable if, as seems clear, innocent employees had to live for some years on reduced incomes as a combined result of the delay and the company's illegal failure to reinstate them.

*Id.* at 265–66. Since then, we and the Supreme Court have faithfully applied

this precedent.[10] *See, e.g.*, *NLRB v. Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers*, 466 U.S. 720, 725 (1984); *Marshall v. Sun Oil Co. (Del.)*, 605 F.2d 1331, 1339 n.9 (5th Cir. 1979); *French's Est. v. FERC*, 603 F.2d 1158, 1167 (5th Cir. 1979); *J. H. Rutter Rex Mfg. Co. v. NLRB*, 473 F.2d 223, 228 (5th Cir. 1973); *NLRB v. Uranga*, 468 F.2d 1397, 1397 (5th Cir. 1972). The majority disregards this long line of precedent and relies upon the same reasoning that the Supreme Court rejected in *J. H. Rutter-Rex*. *Compare, e.g.*, *ante*, at 12 ("AllService had no reason to think this long-dead case was coming back to life."), *with J. H. Rutter-Rex*, 399 F.2d at 363 (reasoning that the Board's delay "lulled [the employer] into the belief that the Board was satisfied and that no further action was to be expected"). Obviously, I disagree with the majority's approach of firmly placing the consequences of the Board's delay upon wronged employees to the benefit of a wrongdoing employer with no true attempt to carefully balance the equities at issue. Properly examined, equity compels the opposite result.

2

---

[10] JUDGE POSNER's reasoning in *NLRB v. Thill, Inc.*, 980 F.2d 1137 (7th Cir. 1992), is a straightforward application of this logic. There, the Board sought enforcement of an order issued some eight years after the ALJ's decision. *Id.* at 1148. The order required the employer to provide back pay with eleven years of interest and to continue bargaining with the union. *Id.* The Seventh Circuit, relying on *J.H. Rutter-Rex*, enforced the back pay specification, noting that the delay allowed the company to retain funds that should have been paid to workers and that the interest simply corrected for the delay. *Id.* at 1141 (citing 396 U.S. at 265).

As for the bargaining order, however, the court found it "questionable" given the substantial changes in both union and management, and the lack of any evidence suggesting the union still had majority support. *Id.* at 1142. The court, relying on *P*I*E Nationwide* and *Texas Petrochemicals*, reasoned that for an aged bargaining order to be enforced, the Board must explain why the passage of time had not rendered the order irrelevant. *Id.* at 1142–43 (first citing 894 F.2d at 890–93; and then citing 923 F.2d at 405–06). Since the Board failed to provide such justification, the bargaining order was not enforced. *Id.* at 1143.

No. 22-60514
c/w No. 23-60293

I fear the majority's legal errors extend beyond the equities to its position that the Board's voluntary dismissal of the earlier 2014 enforcement action was presumptively with prejudice. Of course, nothing in our July 3, 2014, order granting dismissal indicates a dismissal with prejudice. Instead, the majority posits that we dismissed the Board's 2014 application under Rule 42(b) of the Federal Rules of Appellate Procedure, and such a dismissal is presumed to be with prejudice. *Ante*, at 12–14. This holding has no basis in the rules of appellate procedure or our caselaw.

First, the majority can find no support in the rules. Rule 42(b) itself, which provides that "[a]n appeal may be dismissed on the appellant's motion on terms agreed to by the parties or fixed by the court," does not indicate whether a dismissal is with prejudice. If anything, by its plain text, the rule contemplates no presumption, allowing dismissal only "on terms agreed to by the partiers or fixed by the court." The majority points to 5TH CIR. R. 42.4, which states:

> In acting on a motion under 5TH CIR. R. 27.1.3 to stay further proceedings, the clerk may enter such appeals or agency review proceedings as dismissed without prejudice to the right of reinstatement of the appeal within 180 days from the date of dismissal. Any party desiring reinstatement . . . must notify the clerk in writing within the time period allowed for reinstatement. This procedure does not apply where the stay is sought pending a decision of this court in another case, a decision of the Supreme Court, or a stay on the court's own motion. If the appeal is not reinstated within the period fixed, the appeal is deemed dismissed with prejudice. However, an additional period of 180 days from the date of dismissal will be allowed for applying for relief from a dismissal with prejudice which resulted from mistake, inadvertence, or excusable neglect of counsel or a pro se litigant.

However, 5TH CIR. R. 42.4 is inapplicable, as it applies only when a party

37

files a motion to stay under 5TH CIR. R. 27.1.3, in which case the clerk "may" instead dismiss the case without prejudice to the right of reinstatement of the appeal within 180 days. This procedure was not applicable in this case, and the text of the rule, which itself limits its procedures to a narrow set of circumstances, in no way indicates it is the exclusive way to receive a dismissal without prejudice.

Second, the majority's reliance on the observation of commentators Wright and Miller and our holding in *Colbert v. Brennan*, 752 F.3d 412, 416 (5th Cir. 2014), is similarly misplaced. *Ante*, at 13. As to Wright and Miller, the majority omits the second half of the sentence, which provides the necessary context: "[c]ourts have generally held that an appeal, once voluntarily dismissed, will not be reinstated; *under that view*, the appellant who changes his or her mind after a voluntary dismissal is out of luck *if a timely notice of appeal can no longer be filed*." 16AA CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 3988 (5th ed.), Westlaw (database updated Apr. 2023) (emphasis added). Wright and Miller simply state that an appellant who voluntarily dismisses his appeal must still abide by the normal time period to file a notice of appeal. If he wishes to refile or revive his appeal, he must do so in that same time period, and, if that period expires, he cannot fall back on an initial timely appeal that has been dismissed. We held the same in *Colbert*, stating, "a party's voluntary dismissal of an appeal not yet docketed effectively voids any filed notice of appeal. . . . [S]uch an appeal cannot be revived *after the expiration of the original appeal period*." 752 F.3d at 416 (emphasis added) (citing *Williams v. United States*, 553 F.2d 420, 422 (5th Cir. 1977)). Neither Wright and Miller nor *Colbert* establish that a dismissal under Rule 42(b) is presumed to be with prejudice.

Even applying the actual principle expressed by Wright and Miller and *Colbert*—that an appellant who voluntarily dismissed his appeal must refile

No. 22-60514
c/w No. 23-60293

or revive his appeal before the normal deadline to file an appeal passes—the Board's current application for summary enforcement is timely. Neither Federal Rule of Appellate Procedure 15(b)—which provides the procedures to apply for enforcement of an agency order—nor Section 10(e) provides a deadline for the Board to seek enforcement of its orders.

Contrary to the majority's conclusion, authority supports the general rule that a voluntary dismissal is without prejudice, unless otherwise noted. Commentators note the general rule that "[a] dismissal order which is silent as to whether it is with or without prejudice is presumed to be without prejudice . . . ." 50 C.J.S. *Judgments* § 1054, Westlaw (database updated Dec. 2024). Moreover, the portions of Wright and Miller and *Colbert* relied on by the majority actually imply that a voluntary dismissal is generally *without* prejudice, as they note that an appellant may refile or revive a voluntarily dismissed appeal within the normal time limit for filing appeals. The practice of our court reinforces this rule that voluntary dismissals are generally without prejudice. We frequently specify when we dismiss an appeal with prejudice;[11] in contrast, I know of no case from our court

---

[11] *See, e.g., Eaux Holdings, L.L.C. v. Scottsdale Ins. Co.*, No. 22-30455, 2023 WL 371645 (5th Cir. Jan. 19, 2023); *Taylor v. Union. Pac. R.R. Co.*, No. 22-30635, 2022 WL 19401687 (5th Cir. Dec. 6, 2022); *Ruiz v. Turn Servs., L.L.C.*, No. 21-30374, 2022 WL 2390133 (5th Cir. Jan. 11, 2022); *Life Church of Oak Grove, Inc. v. Guideone Mut. Ins. Co.*, No. 21-30298, 2021 WL 5851071 (5th Cir. Nov. 18, 2021); *Cormeum Lab Servs. v. Coastal Lab'ys, Inc.*, No. 21-30502, 2021 WL 6884867 (5th Cir. Oct. 18, 2021); *Vines v. Wyatt Energy Res., L.L.C.*, No. 21-60378, 2021 WL 4994450 (5th Cir. July 12, 2021); *Violet Dock Port, Inc. v. Heaphy*, No. 19-30992, 2020 WL 9848394 (5th Cir. Dec. 29, 2020); *Maxwell v. Wash. Cnty.*, No. 19-60940, 2020 WL 3470320 (5th Cir. Feb. 5, 2020); *Helpful Hound, L.L.C. v. New Orleans Bldg. Corp.*, No. 18-31001, 2019 WL 11769327 (5th Cir. May 29, 2019); *In re DePuy Orthopaedics, Inc. Pinnacle Hip Implant Prod. Liab. Litig.*, No. 17-10017, 2019 WL 13161931 (5th Cir. Mar. 15, 2019); *Harney v. Select Portfolio Servicing, Inc.*, No. 18-30410, 2019 WL 13217907 (5th Cir. Mar. 7, 2019); *Swenson v. Lincoln Nat'l Life Ins. Co.*, No. 18-30852, 2018 WL 11451152 (5th Cir. Dec. 6, 2018); *Deaton v. Glaser*, No. 18-30928,

specifying as a rule that a voluntary dismissal is with prejudice. Finally, the analogous provision of Federal Rules of Civil Procedure governing voluntary dismissals in the trial court further supports the position that voluntary dismissals are generally without prejudice, as it provides that, "[u]nless the order states otherwise," a voluntary dismissal at the plaintiff's request "is without prejudice." FED. R. CIV. P. 41(a)(2).

It appears the actual focus of the majority is the length of time the Board took to readopt the ALJ's 2013 recommendation and seek enforcement of its new order in this court. Of course, the time limits established by Congress to seek appellate review are jurisdictional, *see Bowles*, 551 U.S. at 208–09, but as stated, there is no time limit for the Board to seek enforcement of its order. *See* FED. R. APP. P. 15(b); 29 U.S.C. § 160(e). The majority effectively imposes a jurisdictional time limit for seeking appellate-court enforcement that does not exist. While such a rule may be good policy, we are judges, not policymakers. As judges, we "are obliged to decide cases within the scope of federal jurisdiction." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72 (2013). There is no procedural bar preventing us from considering the Board's application for summary enforcement.

## III

I also think the majority gets the merits of AllService's petition for review wrong. I find no merit in the majority's conclusion that the Board lacked substantial evidence to attribute Lungrin's activities to AllService, and that the Board lacked substantial evidence to find that AllService's pre-

---

2018 WL 7246464 (5th Cir. Sept. 27, 2018); *Thompson v. Hamp*, No. 17-60396, 2017 WL 5897569 (5th Cir. Aug. 14, 2017); *Gibson v. Leson Chevrolet Co.*, No. 17-30447, 2017 WL 5897565 (5th Cir. June 16, 2017); *Nguyen v. Cangelosi*, No. 16-31264, 2017 WL 11777013 (5th Cir. Jan. 26, 2017).

election layoffs were related to protected union activity.

The Board's factual findings are "conclusive" so long as they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e). "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion. It is more than a mere scintilla, and less than a preponderance." *Int'l Bhd. of Elec. Workers*, 973 F.3d at 457 (citation omitted). "Recognizing the Board's expertise in labor law, we will defer to plausible inferences it draws from the evidence, even if we might reach a contrary result were we deciding the case de novo." *J. Vallery Elec., Inc. v. NLRB*, 337 F.3d 446, 450 (5th Cir. 2003). "In determining whether the Board's factual findings are supported by the record, we do not make credibility determinations or reweigh the evidence." *NLRB v. Allied Aviation Fueling*, 490 F.3d 374, 378 (5th Cir. 2007).

A

Substantial evidence supports the ALJ's conclusion that Lungrin was both a "supervisor" and an "agent" of AllService for the purpose of liability under Section 8(a)(1) of the NLRA. "Whether an employee is a supervisor is a question of fact." *Entergy Gulf States, Inc. v. NLRB*, 253 F.3d 203, 208 (5th Cir. 2001) (citing *Monotech of Miss. v. NLRB*, 876 F.2d 514, 516 (5th Cir. 1989)). Section 2(11) of the NLRA broadly defines supervisors to include those individuals having authority "to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action . . . ." 29 U.S.C. § 152(11). The Supreme Court has interpreted Section 2(11) to establish a three-part test:

> Employees are statutory supervisors if (1) they hold the authority to engage in any 1 of the 12 listed supervisory functions, (2) their "exercise of such authority is not of a merely routine or clerical nature, but requires the use of

independent judgment," and (3) their authority is held "in the interest of the employer."

*NLRB v. Ky. River Cmty. Care, Inc.*, 532 U.S. 706, 713 (2001) (quoting 29 U.S.C. § 152(11)). In addition, we may rely on "various 'secondary indicia' of such authority" such as "whether the employee is perceived by co-workers as a supervisor[.]" *Poly-Am., Inc. v. NLRB*, 260 F.3d 465, 479 (5th Cir. 2001).

Here, Lungrin was the "eyes and ears" of AllService owners, Luke and Janice Hall, and he acted to monitor the progress of work and to carry out the directives given to him by the Halls. When the Halls provided a directive to Lungrin, he distributed daily assignments to employees and guided them throughout the day to accomplish that task. The ALJ determined that Lungrin exercised independent judgment in doing so because he, *inter alia*, examined blueprints, gauged the progress of work, identified and allocated tasks among available workers depending on their classification, and recommended to the Halls whether additional personnel could be temporarily allocated to complete various tasks. Further, multiple employees testified that Lungrin was their "boss," "supervisor," or "superintendent." Although Luke Hall claimed he and Janie Hall were the exclusive supervisors for AllService, the ALJ found this testimony "less than credible" given his lack of physical presence at job sites and the inconsistencies between his testimony and prior sworn affidavits. Given this substantial evidence, the ALJ properly concluded that Lungrin was a "supervisor" within the meaning of Section 2(11) because he exercised independent judgement, in the interest of AllService, to assign various duties to employees.

As to agency, I agree with the majority that "[a]n employer's responsibility for the acts of an agent is determined in accordance with the

ordinary common law rules of agency." *Ante*, at 15 (quoting *Poly-Am., Inc.*, 260 F.3d at 480). "One of the primary indicia of agency is the apparent authority of the employee to act on behalf of the principal." *Poly-Am., Inc.*, 260 F.3d at 480. Thus, substantial evidence must support "(1) that the acting party subjectively believed that the agent had authority to act for the principal and (2) that the subjective belief in the agent's authority was objectively reasonable." *Id.* (quoting *Myers v. Bennett Law Offs.*, 238 F.3d 1068, 1073 n.2 (9th Cir. 2001)). "Like the issue of supervisory status, the existence of an agency relationship is a factual matter . . . ." *Id.* (citation omitted).

The ALJ concluded that Lungrin was an "agent" for AllService because he supervised employees *and* communicated work assignments. The majority does not contest that substantial evidence supports a view that Lungrin was an "agent for the purposes of work assignments" but contends that it is error for the ALJ to have concluded that Lungrin was an agent "for all purposes" because his anti-union statements exceeded "the scope of that limited role." *Ante*, at 16. As a result, the majority contends that "Lungrin's actions cannot be attributed to AllService" for the purpose of liability under Section 8(a)(1) of the NLRA. *Id.* Respectfully, this is untrue. The majority's contention relies on *NLRB v. Schroeder*, 726 F.2d 967, 971 (3d Cir. 1984), where the Third Circuit cautioned against assuming the actions of a supervisor can be attributed to that of management. In so holding, the Third Circuit suggested we should commit ourselves to an "individualized inquiry" to determine whether the supervisor was "reasonably viewed by his listening employee colleagues as speaking on behalf of management." *Id.*

Notwithstanding that *Shroeder*'s observations are non-binding, substantial evidence supports that the employees at issue here—Barbour, Grimes, Donaldson, and Hernandez—reasonably viewed Lungrin as speaking on behalf of management when making his anti-union statements and when he unlawfully surveilled union activities. As explained above, these

employees viewed Lungrin as their "boss," "supervisor," or "superintendent." He was undisputedly the "eyes and ears" of AllService's management and the first, and frequently only, point of contact between AllService's management and its employees. In this capacity, Lungrin questioned employees about their attendance and activities at union meetings, revealed that AllService was "closely monitoring" union activities through Lungrin, and relayed the words of Mr. Hall when warning the company would shut its doors should the employees unionize. This substantial evidence gave the employees at issue "every reason to believe" that Lungrin spoke on behalf of AllService. *See NLRB v. CER Inc.*, 762 F.2d 482, 487 (5th Cir. 1985).

B

Finally, I do not understand how the majority can conclude that the Board lacked substantial evidence that AllService's pre-election layoffs were related to protected union activity. The majority seems to rely on two findings: (1) that Lungrin's conduct cannot be attributed to AllService because he was not an "agent" of AllService; and (2) that "the Board failed to consider evidence that undermined its conclusion." *Ante*, at 17. I have already addressed why the first of these conclusions is incorrect above. I now address the second.

According to the majority, the record contains some testimonial evidence that Mr. Hall did not harbor anti-union animus. *Ante*, at 17–18. Specifically, the majority points to the following testimonial evidence: (1) LeBlanc testified that he never had any disagreements with Mr. Hall; (2) no employee ever told LeBlanc they were concerned Mr. Hall would fire them for supporting the Union; (3) multiple employees testified that Mr. Hall never expressed a negative opinion about the Union; and (4) Mr. Hall hired two of the later-fired employees knowing they were Union members. *Ante*, at

17–18. The majority argues that the ALJ's animus analysis, which partly relied on anti-union comments by Mr. Hall, did not explicitly address these contradictions in its written recommendation, and the ALJ's "failure . . . to consider 'contradictory evidence or evidence from which conflicting inferences could be drawn' means the Board's order lacks substantial evidence." *Ante*, at 18 (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Put another way, the majority would deny Board enforcement actions anytime the Board failed to "consider," "grapple with," or "mention" contradictory evidence in its written reasons. *Ante*, at 14, 17–18; *Dish Network Corp.*, 953 F.3d at 377 (citing *Entergy Miss., Inc.*, 810 F.3d at 297–98).[12] I must disagree for two reasons.

*First*, the ALJ *did* consider these countervailing portions of the record. The ALJ made clear that his decision was based upon a review of "the entire record, including [his] observation of the demeanor of witnesses, and after considering the parties' briefs[.]" The ALJ's findings weighed a myriad of documentary and testimonial evidence, including from Mr. Hall, concerning his lack of union animus. But the ALJ found Mr. Hall's testimony to be contrary to the available evidence or entirely incredible[13]—a determination

---

[12] The majority also relies on this court's recent plurality opinion in *Tesla, Inc.*, 120 F.4th at 441, to say that the "Board must do more than simply support an inference that protected conduct is a motivating factor in the employer's decision." *Ante*, at 18. Fortunately, the plurality's analysis commanded only eight votes of the seventeen-member en banc court, and thus "is not binding precedent." *See K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010).

[13] Regarding Mr. Hall's threat of closing AllService should the employees unionize, the ALJ wrote, "I do not credit Mr. Hall's denial of the plant closure threat. I found him to be a less than credible witness, who while extremely helpful on direct, appeared argumentative, difficult, and sporadically sarcastic on cross-examination." With regards to the post-election threats, "I found Lungrin and Mr. Hall to be less than credible." Finally, when examining whether Lungrin was an "agent" of AllService, "I do not credit Mr. Hall's

that is "accord[ed] special deference." *NLRB v. Cal-Maine Farms, Inc.*, 998 F.2d 1336, 1339 (5th Cir. 1993). In addition, the majority's examples of "contradictory evidence" that the ALJ purportedly failed to consider do not move the needle. The majority broadly claims that "Leblanc testified that he never had any disagreements with [Mr.] Hall," *ante*, at 18, but his testimony actually reveals that LeBlanc only asserted that Mr. Hall never "shout[ed]" or used any "aggressive words" when demanding he leave AllService's parking lot after distributing pro-Union leaflets. This was immediately preceded by Lungrin demanding LeBlanc "wipe [his] ass" with the leaflet; Lungrin then "screamed across the parking lot that [AllService] was . . . a nonunion shop and that it would always be a nonunion shop." The ALJ examined this incident in detail. And contrary to the majority's characterization that "[m]ultiple employees" (*i.e.*, two) testified that "Hall never expressed a negative opinion about the [U]nion," *ante*, at 18, the record shows that the first employee testified that Hall didn't offer *any* opinion about the Union to him in particular and the second "never had a conversation with Mr. Hall." Finally, the ALJ specifically acknowledged the prior union membership of the later-fired employees in its findings. Distilled to its essence, the majority is improperly reweighing the evidence just for the sake of ruling against the Board. *Allied Aviation Fueling*, 490 F.3d at 378.

*Second*, the ALJ is not required to "grapple with" or "mention" contradictory evidence in its written reasons, and the majority misinterprets *Universal Camera* as imposing such a requirement. In *Universal Camera*, Justice Frankfurter directed "courts" to "account [for] contradictory evidence or evidence from which conflicting inferences could

---

claim . . . I found his demeanor to be less than credible. . . . Mr. Hall's testimony on these issues was inconsistent with his sworn affidavit, and election challenges of plumbers Neal, Hernandez, and Vince as supervisors."

be drawn" when reviewing the findings underpinning Board enforcement actions for substantial evidence. 340 U.S. at 474. "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Id.* at 488. But "[t]o be sure, the requirement for canvassing 'the whole record' in order to ascertain substantiality does not furnish a calculus of value by which a reviewing court can assess the evidence." *Id.* at 487–88. Board findings may be set aside only where the record "clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both." *Id.* at 490. Our substantial evidence review was never "intended to negative the function of the Labor Board"—the undisputed expert in labor relations—nor was it designed to permit us to "displace the Board's choice between two fairly conflicting views, even though [we] would *justifiably* have made a different choice had the matter been before [us] de novo." *Id.* (emphasis added). This latter bar is exactly why "we do not make credibility determinations or reweigh the evidence." *Allied Aviation Fueling*, 490 F.3d at 378.

With this in mind, our court has found no substantial evidence where, for example, "the ALJ ignore[d] all management testimony" and "all testimony . . . that would hurt [a claimaint's] case." *Lord & Taylor v. NLRB*, 703 F.2d 163, 169 (5th Cir. 1983). Inexplicably, a panel of this court then broadened *Universal Camera* to cases where the Board ignored "significant portions of the record" that "arguably" opposed the Board's reasoning. *Entergy Miss., Inc.*, 810 F.3d at 297 (citing *Carey Salt Co. v. NLRB*, 736 F.3d 405, 410 (5th Cir. 2013)).[14] And then again without explanation, in a different

---

[14] The majority disputes that *Entergy* broadened our then-existing substantial evidence review because it "invoked precedent dating back to the 1980s." *Ante*, at 18. The

No. 22-60514
c/w No. 23-60293

case, the majority's author extrapolated this to mean that the Board lacks substantial evidence "*merely because it failed to grapple* with countervailing portions of the record." *Dish Network Corp.*, 953 F.3d at 377 (citing *Entergy Miss., Inc.*, 810 F.3d at 297–98) (emphasis added). Now, the majority creates an even more demanding standard by suggesting that the Board's failure to specifically "*mention* [contradictory] evidence in its [written] analysis" is grounds for finding no substantial evidence. *Ante*, at 18 (emphasis added). *Universal Camera* never set such a low bar to deny enforcement of a Board order for lack of substantial evidence and the end result of this drastic, new, and unprecedented requirement will be to permanently frustrate the Board's ability to hold employers accountable for violating labor laws.

Armed with this holding, future enforcement actions will be frustrated by employers pointing to a handful of examples of contradictory testimony across hundreds or thousands of pages of testimony, which the failure of the ALJ to explicitly examine in its written recommendation, in the majority's view, requires us to find no substantial evidence. This is despite the fact that the ALJ has told us he reviewed "the entire record." The absurdity is aggravated in this case because AllService did not file exceptions with the Board identifying where it believed the ALJ failed to fully "grapple with" contradictory evidence. Without flagging any alleged contradictions to the Board prior to enforcement, AllService asks us to dig them up and conclude

---

finer details show otherwise. *Entergy* relied on *Carey Salt Co.*, 736 F.3d at 410, which in turn, relied on *Lord & Taylor* for the proposition that "[a] decision by the Board that 'ignores a portion of the record' cannot survive review under the 'substantial evidence' standard." *Entergy Miss., Inc.*, 810 F.3d at 297 (quoting *Carey Salt Co.*, 736 F.3d at 410). But the issue presented in *Lord & Taylor* was a far-cry from that of *Entergy*. It was not just that some evidence could have "arguably" opposed the Board's reasoning, *id.* at 298, but that the ALJ ignored *all* contrary evidence put forward by the employer. *Lord & Taylor*, 703 F.2d at 169.

there was no substantial evidence. After all, why make labor-law-violating employers spend their time and resources preserving and exhausting their objections when we can simply waste ours and the Board's by reviewing them in the first instance instead? Respectfully, this cannot be the rule. The ultimate outcome of the majority's holding today will be to aid wrongful employers in evading Board enforcement actions and to frustrate the intent of the NLRA—all to the detriment of wronged employees.

\* \* \*

I would follow the straightforward directives from Congress and precedent from the Supreme Court and our own court, which compel us to grant summary enforcement to the Board and deny AllService's petition for review. Because the majority concludes otherwise, I respectfully dissent.